SIMON BROLASKY *v.* WATERS B. MILLER, JOSEPH WARE, *et al.*

B. agreed to loan to C. $2,800, on condition that C. would receive from B. $800 in goods, at prices fixed by B., and pay, or allow B. to retain, 5 per cent, or $100, on the remaining $2,000, and give to B. his bond and mortgage for $2,800, with lawful interest.

The bond and mortgage were held to be usurious.

Bill for foreclosure, filed September 5, 1850, on a mortgage, dated May 18, 1846, given by James Clark to Simon Brolasky, to secure the payment of a bond, of the same date, given by said Clark to said Brolasky, conditioned for the payment of $2,800 in two years, with legal interest.

The bill states, that, on the 6th of August, 1844, William A. Burk and David Winebrener, then the owners of the premises, with their wives, made and executed to Eveline Hughes a mortgage on the premises, to secure $150, for which she held the bond of the said Burk and Winebrener.

That the said James Clark, being indebted to Peter A. Keyser and Francis B. Warner, in a bond for $1,416, dated February 5, 1847, payable in one year, with interest, in order to secure the payment thereof, made and executed to the said Keyser and Warner a mortgage on the same premises.

That, the said James Clark being in failing circumstances, several suits were commenced against him, and judgments enthereon, upon which executions were issued and delivered to the Sheriff of the County of Cape May, and levied upon the said mortgaged premises ; and the same were advertised for sale by the said Sheriff, and were, on the 10th of May, 1850, sold by the said Sheriff, subject to mortgage liens ; and Waters B. Miller and Joseph Ware became the purchasers thereof; and the said Sheriff executed a deed to them accordingly, and they have taken possession of the premises.

The defendants, Miller and Ware, in their answer, deny that

the bond and mortgage given by said Clark to the complainant were given for a *bona fide* and valid consideration. They say, that they have been informed and believe, and therefore charge, that the said Clark was the proprietor and keeper of a hotel or boarding house, at Cape Island ; that, being in need of large sums of money with which to pay certain debts and to make the necessary preparations for the accommodation of company at the approaching bathing season, he made application to the complainant for the loan of $3,000. That the complainant declined loaning him so large an amount ; but finally agreed to loan him $2,800, on condition that the said Clark would pay to him, the complainant, $100 over and above the legal interest, as a bonus or consideration for the making of the said loan and the use of the said money, and that said Clark should receive from the complainant $800, as part of said loan, in goods, wares and merchandise, at prices to be fixed by the complainant ; the balance, $1,900, to be paid by the complainant to the said Clark in cash. And these defendants say, that the said Clark, finding that he could not procure the said loan upon more fair and just terms, and being greatly straitened in his circumstances and in want of funds, finally acceded to the demands and conditions of the complainant, and agreed to borrow said money upon the terms and conditions aforesaid, and did thereupon execute and deliver to the complainant the bond and mortgage in the bill mentioned.

And these defendants say, that they are informed and believe, and charge, that the complainant did receive and take from the said Clark the said bonus or consideration of $100, over and above the lawful interest, for the loan of the said money, goods, wares and merchandize, and that the complainant charged the said Clark, for the goods, wares and merchandise delivered to him under the said agreement, and as part of said loan, exorbitant prices, far exceeding the current market prices at that time, and greatly beyond the true value of said goods, wares and merchandise ; and that, instead of paying to the said Clark the balance of said loan, to wit, $1,900, in cash, as had been agreed upon between them, the complainant required the said Clark to take, in lieu thereof, certain promissory notes for that amount,

payable at periods long subsequent to the dates thereof, and thus subjecting the said Clark to further loss upon the said loan. And these defendants submit, that, for the reasons above stated, the said bond and mortgage are usurious and utterly void, under the statute in such case made and provided.

These defendants further say, that the bond and mortgage, mentioned in the bill, given by Burk and Winebrener to Eveline Hughes, were, by the said Eveline, for a good and valuable consideration, assigned and transferred to this defendant Waters B. Miller; and that the said bond and mortgage, in the bill mentioned, given by the said Clark to the said Keyser and Warner were, by the said Keyser and Warner, on the 1st November, 1850, in consideration of $1,416 paid to them by these defendants, assigned and transferred to these defendants.

They admit they bought the premises at the Sheriff's sale; but aver that they did so under the opinion and belief that the complainant's said mortgage was illegal and void; and they say, that the Sheriff did not at the time of said sale, so far as they heard or believe, make any stipulation, reservation or allusion to the said mortgage of the complainant, or any incumbrance whatever, upon the premises. And they deny that they purchased the said premises under the express condition that they would pay off the complainant's pretended claim, or any other claim.

They say they are not informed, and do not know, whether the said Keyser and Warner, at the time they received the mortgage so made to them, had any knowledge or information of the complainant's mortgage.

Replication.

*James Clark*, one of the defendants for the above entitled case, (against whom a decree *pro confesso* had been entered, and who is examined by virtue of an order of this Court, a copy of which is annexed to these depositions,) being produced upon the part of the other defendants and duly sworn according to law, doth depose and say. At the time I wanted some money I incidentally mentioned it to Mr. William Burk, of Philadelphia, and

he proposed to negotiate a loan for me.    I wanted $3,000.
*Question* by defendant's counsel.    Did you give Mr. Burk any
instructions as to the amount he might pay for this loan?    (Any
conversation between the witness and Mr. Burk objected to by
the solicitor of the complainant.)    *Answer.*    Mr. Burk some
time afterwards came to me and said he could procure for me a
loan of $2,800, provided I would be willing to pay a bonus of
$100 for the money.    He said Mr. Brolasky, the complainant,
would let him have the money provided I would pay a bonus of
$100.    I told him I wanted the money pretty badly and must
have it, and instructed him to get it on those terms.    Mr. Burk
procured the amount I required and there were some transactions
between him and me and he paid me over the balance of the
$2,800, after taking out the amount due to him.    Mr. Burk
held the bonds and mortgages, one to himself for $800, the other
to John Flanagin and Son for $600.    I am not certain whether
there were mortgages accompanying the bonds or not.    Mr. Burk
sold these mortgages, I presume, to Mr. Brolasky.    The whole
amount, including what I owed Mr. Burk and what I got, was
$1,900.    I am not enabled to say the exact amount in cash I
got from Mr. Burk.    I got some dry goods of Mr. Burk and
then I purchased a lot of him adjoining my other property.    I
allowed him $600 for the lot.    I got some dry goods from Burk
(the amount I don't remember) previous to the loan, and some
after the loan, all of which were taken out of the money I got of
Mr. Brolasky.    I gave three different papers to Mr. Brolasky
a few days since, and among them was one bill, I think, of dry
goods.    The balance of the $2,700 I got in dry goods from M.
Brolasky.    When I borrowed the money the agreement was that
I was to take $800 out in dry goods.    $2,700 made up in this
way was the whole amount I received, and for this sum I gave
the mortgage of $2,800.    Mr. Burk did all the bargaining for
me and I signed the bond and mortgage.    It was a voluntary
thing upon the part of Mr. Burk.    I have paid Mr. Brolasky
interest upon this bond and mortgage—paid interest upon the
whole amount of $2,800.    I have receipts which show the
amount of interest I have paid—about $600.    A paper writing

purporting to be a receipt on account of interest for $115, dated August 2d, A. D. 1847, and signed by S. Brolasky, is offered in evidence and marked *Exhibit No.* 1, *ex parte* defendants. A paper purporting to be a receipt dated August 5th, 1848, for $144.75, being shown witness, he says part of this receipt was for interest. A carriage for $85 was to come out of it—also a tongue for $10, and two lots of carpeting, which, according to my impression, cost $40. The balance of the receipt was for interest. This receipt is offered in evidence, and is marked *Exhibit No.* 2 *ex parte* defendants. A paper purporting to be a receipt, dated August 11th, for $42 for interest, bill of $10.72, leaving the amount of $31.28, and signed by Simon Brolasky, is offered in evidence and marked *Exhibit No.* 3, *ex parte* defendants. Also a receipt dated August 30th, A. D. 1849, for $60 for interest from James Clark, and signed by Simon Brolasky, marked *Exhibit No.* 4, *ex parte* defendants. A paper purporting to be in part a receipt, dated August 13th, A. D. 1849 for $41.83 for interest and signed by S. Brolasky, is offered in evidence and marked *Exhibit No.* 5, *ex parte* defendants. A paper writing purporting to be a note for $127.65, made by James Clark to Simon Brolasky, and dated July 7th, A. D. 1846, being shown to witness, he says this note was given by me for a balance of interest on this mortgage. This paper is offered in evidence, and is marked *Exhibit No.* 6, *ex parte* defendants. A paper purporting to be a due bill from James Clark to Simon Brolasky, for $36.65, and dated August 5th, A. D. 1848, is offered in evidence, and is marked *Exhibit No.* 7 *ex parte* defendants. This receipt being shown witness, he says I can't say whether it was for interest or not. We had other transactions—it may be or it may not. The other receipts I am pretty positive were for interest. I have had a conversation with Mr. Brolasky in regard to this transaction recently. Mr. Brolasky stopped in here day before yesterday. He spoke of Mr. Burk and his transaction. He said Mr. Burk was a curious kind of a man and he could not make out what kind of a man he was. He said something about having my affidavit taken in this case, and

I told him I understood the time appointed was for the 31st of July. He did not ask me what I would swear to. That was about all, as near as I can recollect. We have conversed upon the subject several times previous to day before yesterday. In these prior conversations the substance of them was pretty much the same as in the last. Mr. Brolasky said he hoped I would not do anything to injure him. I told him I did not want to injure any man if I could avoid it, but if I was called upon to give evidence I must tell what I knew. His son Henry was with him upon one or two occasions when he called, and Mr. Richard P. Thompson was with him upon one occasion. When I told him I did not want to do anything to injure him I don't recollect whether he replied to it or not. He did not offer me any money, but made a proposition to me, the amount of which was, that if I could give my influence in his favor in the case he would give me $100. No one was by when he made this proposition to me. He made this proposition to me I think about three or four weeks since. It was at the same time Mr. Brolasky said he hoped I would not do anything to injure him, and he repeated this several times. It was a matter that I thought would never be called up, as I had no interest in it whatever. Mr. Brolasky never exacted from me a promise that I would not tell something connected with the matter. He did in relation to some other matter. It had some connection with this matter, but not in the shape of borrowing money. It was in relation to a receipt for interest which Mr. Brolasky cancelled. I gave him a bill for some goods he got. The receipt Mr. Brolasky signed for $172 was a receipt given me by him for interest on this bond and mortgage. The receipt was for $172, and the bill was for $141. Deduct the bill from the receipt and it left a balance of $31, for which Mr. Brolasky gave me a due bill. The bill of $141 was given for goods purchased by Mr. Brolasky at my sale of household goods. Mr. Brolasky purchased at the Sheriff's sale $141 worth of goods for me. He paid the Sheriff and I kept the goods and became his debtor for the amount, and this bill was deducted from the amount of the receipt of $172 which had been previously given by Mr. Brolasky to me for in-

terest. Mr. Brolasky destroyed the receipt of $172 when I gave it to him, and requested me to say nothing about it.

Being *cress-examined* upon the part of the complainant, said: I gave a bond and mortgage to Mr. Burk for $800. I think it was in the year 1845. I gave a bond and mortgage to John Flanagin for $600 about the same time. These mortgages Mr. Burk had the control of previous to the negotiation of the new loan from Mr. Brolasky. I presume Mr. Burk sold these mortgages to Mr. Brolasky, because Mr. Brolasky has the mortgage in his possession, and showed me the receipt. This is the only reason I have for thinking so. The only reason I have of knowing what Mr. Burk got for the two mortgages was from seeing the receipts on the back of them. Mr. Brolasky said he paid Mr. Burk $1,300 for the two mortgages. Mr. Burk never told me he had sold the mortgages to Mr. Brolasky or what he had got for them. I don't recollect whether I paid any interest to Mr. Burk and Mr. Flanagin on those bonds and mortgages. I owed Mr. Burk for goods he had previously let me have. I think I may have owed Mr. Burk in the neighborhood of $60 at the time he negotiated the loan with Mr. Brolasky. I got $800 and upwards in store goods. Mr. Brolasky has a paper containing a statement made out by himself, of the exact amount handed to him by me, and which he promised to return to me. I got also from Mr. Burk a lot for which I paid him $600. In all the negotiations for the loan, Mr. Burk made all the agreements and done all the bargaining. I never had anything to do with Mr. Brolasky about the negotiation or about the bonus. I never made any agreement with Mr. Brolasky that I would pay him $100 as a bonus for the loan. I never applied to Mr. Brolasky to make me a loan of money. Mr. Burk, I don't think, has ever applied to me for payment of his bond and mortgage against me previous to negotiating the loan of Mr. Brolasky. When Mr. Burk and I settled, after he had negotiated the loan of Mr. Brolasky, he deducted a bonus of $100, which I allowed him. I think Mr. Burk did not pay me my money. When the bond and mortgage was executed I think my wife was present,

and Mr. Brognard. I think no one else was present. It was done up at the Court House. Mr. Brognard is dead I believe. I have had a conversation with Messrs. Miller & Ware in regard to my chances in the property in dispute in case they get clear of the mortgage. Not in regard to my chances but in relation to the sale of the property. Messrs. Miller & Ware have called upon me twice I think and stated that my affidavit was required in order that I should be heard in Court. Nothing was said about my having an ultimate interest in the property, for that I don't expect to have, neither do they expect me to have. I was not present at the sheriff's sale when the real estate was sold. I considered the property known as the Washington House to be worth $6,000 or $7,000 when I owned it. When I owned it I owed a mortgage to Messrs. Keyser & Warner for $1,300 and some arrears of interest. I think there were no other mortgages upon it at the time of the sale but this mortgage and the Brolasky mortgage. The note marked *Exhibit No. 6* was given for a balance of interest. I am positive. The Brolasky mortgage was given in May, 1846. A bond and mortgage, marked *Exhibits A* and *B, ex parte* complainants, are the bond and mortgage I gave Mr. Brolasky. They are dated May 18th, 1846. I did not owe Mr. Brolasky anything but for interest, except what I have stated. *Question* by the solicitor of the complainant. What did you owe Mr. Brolasky for besides interest? *Answer.* I owed him for a wagon and a tongue; when I purchased the wagon I supposed the tongue went with it. Mr. Brolasky sent it from Philadelphia two or three weeks after I purchased the wagon, and for the tongue he charged me $10 extra. I owed him for carpeting, but the number of yards I don't recollect, but Mr. Brolasky has the number of yards and the price, and that will instruct us upon that head. The carriage was to have been $85. I never had any transaction with Mr. Tompkins in regard to goods bought at the sheriff's sale over and above those embraced in the bill of $141.

Being *re-examined* upon the part of the defendant, said: I learnt since the sale there was a mortgage at the time of the

sale upon the property, held by Eveline Hughes, the exact amount I don't recollect. I think the carriage was taken out of the receipt marked *Exhibit No.* 2. I ratified and confirmed the bargain which Mr. Burk made for me in regard to the bonus of $100 for the negotiation of the loan by Mr. Brolasky. In consequence of the bargain for the bonus of $100, I allowed it in my settlement with Mr. Burk.

*William A. Burk,* a witness produced upon the part of the defendants, being duly sworn according to law, doth depose and say : I am acquainted with Simon Brolasky, of Philadelphia, and with James Clark, of Cape May. Mr. Clark, some time in the year 1846, applied to me to negotiate a loan for him. I negotiated a loan for him at that time with Mr. Simon Brolasky. Mr. Clark wanted $3,000 on his property. Mr. Brolasky did not decide immediately, but went down to Cape May to look at the property. After he returned from Cape May he sent me a note or called at my office to say he wanted me to come up and see him. I went up to his house and saw him, and had some conversation with him about it. He concluded he' would let Mr. Clark have $2,800 on the property at Cape May. His proposition was to give Mr. Clark $800 worth of goods, and he would give $2,000; then he mentioned a discount of five per cent. upon the $2,000. Nothing was said about a discount upon the goods. I wrote to Mr. Clark and mentioned that to him ; he authorized me to accede to these terms and to see Mr. Brolasky, and tell him Mr. Clark would be up in a short time. I completed all the arrangements except the goods, and Mr. Clark selected the goods. I received two notes of Mr. Brolasky, one for $800 and one for $500, and they had thirty days to run. They were Mr. Brolasky's own notes. The balance was paid by a note of longer date for $500 and upwards. I looked over my papers and found no memorandum of the amount. It strikes me it was $216. I have no recollection of receiving anything but these notes to make up the balance of the $2,000. I can't recollect whether I delivered the mortgage to Mr. Brolasky. I can't answer whether the mortgage was delivered before the notes

were given. Mr. Brognard drew up the papers between the parties. Mr. Brognard is dead. The mortgage of $2,000 was given upon a house at Cape Island, occupied for some time by Mr. Clark, called the Washington House. I can't recollect the dates of those notes. I made no memorandum of them; they were drawn at so short a date. Mr. Clark came up and selected a part of the goods before the notes were given. I have no recollection how that matter was settled. I settled with Mr. Clark this mortgage affair, including my own account with him. To the best of my recollection Mr. Brolasky gave me those three notes for Mr. Clark, and the money was coming to me and others. In my settlement with Mr. Clark I did not allow him any more than the proceeds of those three notes. At the time I settled with Mr. Clark I told him the proceeds of those three notes was all I received of the $2,000 of Mr. Brolasky. At the time Mr. Brolasky asked me the five per cent. I told Mr. Clark, and he acceded to it, and authorized me to pay the $100.

Being *cross-examined* upon the part of the complainant, said: There are several other things in relation to the payment of the money, which I have not stated. Messrs. Burke & Winebrener held a mortgage of $800 against Mr. Clark. To the best of my recollection, those two notes, of $800 and $500, given to me by Mr. Brolasky, were to be applied to the payment of Messrs. Burke & Winebrener's mortgage, and one held by Flanagin & Sons. I don't remember the amount of Flanagin's mortgage. I had not the control of Flanagin's mortgage, and I have no recollection of it. I have no recollection of having possession of Flanagin's mortgage. I went down to Mr. Flanagin's several times, and requested him to let me have the mortgage, and to the best of my recollection he would not trust me with anything. I have no recollection of going to Mr. Flanagin's store after the bond and mortgage he held against James Clark. I went repeatedly to Mr. Flanagin's store and told him I was trying to make arrangements to get our money for our mortgages. I mean by our mortgages the mortgages of Burke & Winebrener and of Flanagin. I have no recollection that Mr. Flanagin handed me the mortgage; he might have done so. To the best of

my recollection I told Mr. Flanagin I should charge something
for going down to the Court House and attending to the business.
I went down to Cape May Court House. Mr. Brognard was there
with the papers. Mr. Brolasky was not there. Mr. Flanagin was
not there, nor either of his sons. I can't tell you what was done
there. We went down to attend to this business. Mr. Brognard
attended to the business. Mr. Clark, Mr. Brognard and myself.
It seems in my mind we went to the Clerk's Office. I can't recol-
lect whether we had the old mortgages canceled at that time. I
have no recollection of having anything to do with the new mort-
gage. I don't think it was during the term of Court. I really can't
recollect one single act of business that was done there that day.
I don't remember getting Samuel M. Clement, a Commissioner in
Philadelphia, to draw any paper connected with these mortgages.
*Exhibit C* being shown witness, he says : the signature of Wil-
liam A. Burk, attached thereto, is my signature, and the name
of David Winebrener is Mr. Winebrener's signature. The
writing on the back of it, signed John Flanagin & Sons, I have
no recollection of. I had forgotten all about this paper. I
don't recollect where that paper was executed. I did not know
there was such a man as Samuel M. Clement, at all. I have
no recollection I ever agreed with Mr. Brolasky to have Flana-
gin's mortgage assigned if required. I have no positive recol-
lection how these two notes of $800 and $500 were applied. I
have no recollection of either of them being applied to the pay-
ment of Mr. Flanagin's mortgage or not. I can't answer
whether Flanagin's mortgage was ever paid. I can only say
Mr. Brolasky was to have those mortgages cancelled. *Question*
by complainant's solicitor. Did you not go to John Flanagin &
Sons', in the year 1846, and give them the check of Johnson
Burk & Co. for the amount of Flanagin's mortgage, deducting
five per cent. ? *Answer.* I have no recollection of going there
and giving them our check. *Exhibit D* being shown witness, he
says the signature is mine but the body is not. I don't know
whose handwriting it is. I suppose, upon looking at this paper,
I paid the money to Mr. Flanagin herein mentioned. The money
I received from Mr. Brolasky was appropriated to pay different

individuals. I recollect paying Mr. Keyser $200. He had some claim on the property. The next I presume, went to pay Burk & Winebrener and Flanagin. *Exhibit D*, the receipt, was true when I signed it and I have no knowledge to the contrary but what it is correct. I can't say what was the amount of Flanagin's mortgage. I have no recollection of telling Miss Mary Howell that Burke & Winebrener's mortgage amounted to $800, Flanagin's mortgage to $600, and that I had sold them to Mr. Brolasky for $1,300. I have no recollection of ever saying to Henry Brolasky that I had sold these mortgages for $1,300; that it was a fair transaction and that there was no usury about it, or words to that effect. I remember meeting Mr. Brolasky's son on the street at Cape Island, and asking him for receipt marked *Exhibit D*, that I might show it to Joseph Ware, one of the defendants. He got the receipt and showed it to Mr. Ware in my presence. I might have told Henry Brolasky, and I think it likely I did tell him; I had forgotten I had given the receipt, for I had forgotten all about this. I have no recollection of telling Henry Brolasky upon that occasion that the discount of the $100 was taken out of these two mortgages. I don't recollect why I wanted to show this receipt marked *Exhibit D* to Mr. Ware. It came up in some conversation. I have no recollection of saying to Henry Brolasky when I called upon him to get that receipt, that it was a fair transaction and that if I could show that receipt and explain it to Miller & Ware I thought they would pay the money. I recollect going to Mr. Brolasky's cottage in Cape May, in the month of July, 1851, but whether at night or during the day I can't tell. I then had a conversation with him about these mortgages. I don't recollect any one being present. I think Mr. Brolasky called me out upon the piazza, and we sat down there and talked about it. I don't recollect what was said there. My principal object in going was to get a compromise. Mr. Brolasky had called upon me and asked me to come over there. Our conversation was principally about a compromise. I don't recollect telling Mr. Brolasky what Miller & Ware would give to compromise. I can't answer whether I told Mr. Brolasky in that

·conversation Miller would give $2,800, or whether Ware was willing to give $3,000. Ware seemed anxious to have a compromise, but Miller would not consent to it. I could not have ·told this to Mr. Brolasky in that conversation upon the piazza. I had no conversation with Miller & Ware about a compromise ·until after I had seen Mr. Brolasky. I had talked with Mr. Brolasky at other times, but I can't say that I ever had any other conversation upon the piazza or not. I have no recollection in that conversation on the piazza of saying in the presence of Miss Howell that the bonus of $100 was allowed on the sale of the two old mortgages and taken out of that sale. I don't recollect going to Mr. Brolasky's house in Philadelphia, and then offering him those two mortgages for sale. I have been to his house but I don't recollect talking to him about any mortgage but the last mortgage of $2,800 on the Washington House. I have no recollection when at his house of talking to him about any other mortgage but that. I don't remember going to Mr. Brolasky's house in Philadelphia and asking Miss Howell about the price of the goods Clark got of Mr. Brolasky. I went in the room where the goods were at the time Mr. Clark went to look at them. I might have looked casually at them, but did not examine them separately. There appeared to be a large number of goods. I have no recollection of saying they were cheap or dear. I left that to Mr. Brolasky and Mr. Clark. I mentioned at Cape May in conversation with Mr. Brolasky, at what place I don't recollect, something about a man's giving a carriage and horses to get a loan of money. I don't recollect of saying, but I might have said, in the presence of Miss Mary Howell at Cape May, that Miller wanted to get off like a man in East Jersey, who gave a carriage for the loan of money, but this was a different case, that I had the control of the old mortgages, and had a right to sell them for what I pleased. *Question* by the solicitor of the complainant. Did you ever tell Mr. Brolasky that Miller told you that the Washington House rented for $600, and that Miller & Ware meant to law Brolasky for five or six years, and keep him out of his money—that it would cost him and Ware nothing? *Answer.* There was some conversation to that effect,

but I can't exactly remember what the words were. I am acquainted with Jefferson Brolasky. I have no recollection of having a conversation with him but once about these transactions. It was on board of the steamboat on the Delaware. I think he said he was on his way to the Falls of Niagara. I have no recollection what the particular conversation was. He said his brother was very ill, and he wanted me to go up and see him. I have no recollection of telling him in that conversation the transaction was fair and honest, and there was no usury about it. I I have no recollection telling him I had the control of these two mortgages, and that I had sold them to his brother for $1,300. I don't recollect his asking me if the discount of $100 was taken out of the old mortgage or the new mortgage. I have no recollection of our conversation in particular upon that day. I don't recollect telling him I had offered these two mortgage for sale at the exchange before I had offered them to Mr. Brolasky. I have no recollection of telling Mr. Jefferson Brolasky in that conversation that I took the $100 discount out of the two old mortgages, and that it had nothing to do with the new mortgage. *Question* by complainant's solicitor. Did you ever offer those old mortgages for sale before you offered them for sale to Mr. Brolasky? (Question objected to by defendant's counsel, because it assumes the fact that witness did offer the mortgages for sale to Mr. Brolasky, when there has been no proof of that fact already given in evidence.) *Answer.* I have no recollection of ever offering them for sale to anybody. I never placed these old bonds and mortgages in the hands of a broker to sell for me. I don't recollect whether I ever authorized a broker to part with those bonds for me. It must have been in Philadelphia that Mr. Brolasky gave me his two notes of $800 and $500. I don't recollect what I gave him in return for his notes, or whether I gave him anything or not. I can't tell when I gave him Burk & Winebrener's mortgage. Two papers being shown witness, which are offered in evidence *ex parte* complainant, and marked *Exhibit E* and *F*, he says: *Exhibit E* is Clark's bond, and the signature thereto is his signature. *Exhibit F* is the accompanying mortgage. I can't remember whether I ever saw the bond

and mortgage to Flanagin & Sons. A paper being produced and shown witness, marked *Exhibit G, ex parte* complainant, he says : I have no doubt that is Clark's bond, and the signature of James Clark is his. A paper produced and shown witness, marked *Exhibit H, ex parte* complainant, he says it is the accompanying mortgage. The settlement I had with Mr. Clark, and to which I referred in my examination-in-chief, occurred at his house at Cape Island. I don't recollect any one being by when we settled. Clark and I had several settlements. We settled that with all other matters at the same time. I can't say when the settlement took place ; whether the same year the mortgage was given or not. Mr. Clark bought the Washington House of Burk & Winebrener first ; afterwards I sold him a lot adjoining it, and I got in the neighborhood of $500 for it. He owed me that day for this lot, and I think he owed the firm of Johnson, Burk & Co. for dry goods. He owed me some little on furniture ; I can't tell how much. I have no books, no memorandum, no way of coming at it. I have no recollection of having the new mortgage at all, at any time. I don't recollect whether I had the old mortgage there that day. Mr. Brolasky was not there at that settlement. I have no recollection of having any bills or receipts from Mr. Brolasky there that day. I had a statement of the money received of Mr. Brolasky there. I can't tell whether I had or not, there that day, a written statement of the amount of debt and interest due on that day on the old bonds and mortgages. I don't recollect having any money there that day. We settled the amount of money I received from Mr. Brolasky. There was a note of hand of $500 or $600 I had against Clark, settled. There was also a book account due Johnson, Burk & Co. Mr. Clark allowed $100 for the bonus in our settlement. Mr. Brolasky claimed $100, and I settled it in that way. The goods got by Mr. Clark of Mr. Brolasky, were left at my store by Brolasky. Mr. Brolasky told me at his house when I went up in the morning, that he would send the goods to my store, and I could send them down to the vessel to go to Cape May. *Question* by the solicitor of the complainant. Did you not stand in a stealthy manner at

the corner of Clover and Thirteenth streets, and watch the goods when they were sent from Mr. Brolasky's house, and stop the drayman on his way down, and direct the goods sent to your store? (Question objected to as irrelevant, by the defendant's counsel.) *Answer.* I did not. I went to Mr. Brolasky's yard boldly, and saw them loading the goods. I had a claim of $516 against Mr. Clark, and Mr. Brolasky gave me his note to pay the balance on this mortgage that I speak of. Mr. Brolasky had never paid but $1,300 upon the mortgage. Mr. Clark owed me the $516 for a piece of property he bought of me at the time the goods came to the store—for that I held his note. I don't say it was exactly for $516. That note was paid me by Mr. Brolasky's giving me his note, that canceled so much of the money due from Clark to me, let it be whatever amount it was. I sent the goods down to the vessel the next day, long before Mr. Brolasky gave me that note for $516. The vessel took one case of hats, but was so fully loaded they could not take anyting more. I charged Mr. Flanagin $25 for my services. I think Mr. Flanagin called upon me afterwards, and found fault with what I had charged him. *Question* by the solicitor of complainant. What took place at that interview? (Question objected to by defendant's counsel as irrelevant.) *Answer.* He thought I should not have charged him that $25 for the trouble I had taken to get the money for him. *Question* by Mr. Thompson. Did he not upon that occasion, say to you that you had represented this was to be for the benefit of Mr. Clark, and that you had been keeping the money for yourself? (Question objected to by Mr. Halsted as irrelevant.) *Answer.* I did not. Flanagin was as anxious to get the money as I was. I don't remember whether there was any insurance allowed by Mr. Brolasky. I think I gave Mr. Brognard $10, which was put in the settlement with Clark. I don't remember my expenses being allowed for going to the Court House. I went down to Cape May myself. I don't know how long the goods remained at my store. They were at my store when I went down to Cape May, and I believe they were sent down by the first vessel that could carry them. Mr. Brolasky was at Cape May when I got there.

I never said a word to Mr. Clark that he must pay the $516 before the goods were sent. Mr. Brolasky did not pay for these goods. That $516 was the balance on the mortgage. Mr. Brolasky paid that $516, because he owed it on the mortgage. *Question* by the solicitor of the complainant. Why did Mr. Brolasky pay the debt of Mr. Clark? *Answer.* I can't answer it in any other way than because that was due upon the mortgage. I acted as agent for Mr. Clark, and I was to receive the whole of the money. *Question* by the solicitor of the complainant. Did not Mr. James Clark come to you and ask you why those goods were detained in Philadelphia. *Answer* by the witness. He might have done so. He probably did, but I have no recollection about it. The note of $516 given to me by Mr. Brolasky was drawn, I think, at Cape Island. I was then keeping house at Cape Island. I saw the goods while I was there. I don't recollect whether I saw the goods at Cape Island before or after I got the note of Mr. Brolasky. I remember *being at* Mr. Brolasky's house on the afternoon of one day this week. I understood he had been at my store, and said he wished to see me. I went up and saw him. I don't recollect any one being in the room. *Question.* Did not Brolasky, upon that occasion, complain that it was upon your information to Mr. Howell that this trouble had been made for him. (Question objected to as irrelevant.) *Answer.* No. *Question.* Did you not upon that occasion declare to Mr. Brolasky, that you had never been to any lawyer, or given any information in relation to this business? (Question objected to as irrelevant.) *Answer.* I think I said I had not until this was brought in suit. I was not present at the sale of the Washington House. Mr. Miller said he had bought the property, and had bought it very cheap.

*Jefferson H. Brolasky,* a witness produced upon the part of the complainant, being duly sworn according to law, doth depose and say: I am about 42 years of age. I had a conversation with William A. Burk on the 25th June, 1851, on board a steamboat or railway car between Philadelphia and New York. Mr. Burk told me he had sold the mortgages to my brother for $1,300, the mortgages of James Clark upon the Cape May property;

that he allowed my brother a discount of $100 on these mortgages. The two mortgages were the mortgages of Flanagin and of Burk & Winebrenner; and they amounted to $1,400; and it was upon these mortgages, he said, he had allowed my brother a discount of $100. He added it was a fair business transaction, and that Clark giving information to the purchaser made all the trouble. He said nothing at that time about a new mortgage, nor has he ever said anything about a new mortgage to me.

*Mary Howell,* a witness produced upon the part of the complainant, being duly sworn according to law, doth depose and say : I reside in the city of Philadelphia. I am fifty years of age. I was present in Philadelphia at Mr. Brolasky's house when William A. Burk called and offered the mortgages to Mr. Brolasky for sale. There were two to the amount of $1,400. One was for $800, the other for $600. The one of $800 was given to Burk & Winebrenner, the other of $600 to Flanagin & Sons. He offered the two for $1,300. He said he wanted to raise money very badly, and did not wish to mortgage his house. My brother replied that those two mortgages had been offered to him by Robert Smethers at $1,300, and he refused to buy them. He persuaded Mr. Brolasky, after some conversation, to take them at the $1,300. He was to have the papers fixed and Mr. Brolasky was to call upon him and get them. This must have occurred about the year 1846. I know it was a short time after we closed business. I mean my brother-in-law, who had shortly before ceased keeping store. I assisted him in his store, and was with him 21 years. I mean by my brother-in-law the complainant in this cause. In the summer of 1851, at Cape May, I again saw Mr. Burk at Mr. Brolasky's cottage. Mr. Brolasky and Mr. Burk were setting on the porch. Mr. Burk sent for me to come to him ; he wished to ask me a question concerning a quantity of domestic goods that Mr. Brolasky had bought for Mr. Clark. He asked me also if Mr. Brolasky did not go from home to purchase those goods—that Mr. Ware and Mr. Miller wanted him to say that he did not know anything about it. He

said he had been nearly the whole morning with Mr. Ware, and Ware wished to pay Mr. Brolasky $3,000. That he (Ware) was sorry he ever had anything to do with it, and would be glad to sell his share to get rid of it. Then he referred to Mr. Miller and said he had never met such a dishonorable and dishonest man to deal with. That he (Miller) would not pay the mortgage unless there was a very heavy discount allowed him. Upon that occasion he (Burk) spoke again of the two mortgages, and said he offered them and sold them for the $1,300, and he had a right, they were his own, to sell them for $500 if he chose. He then said Mr. Miller had said the last year he had received $600 rent and would the next year, and showed how Mr. Brolasky with the rent for five or six years for it would cost him nothing. After the above conversation and on the evening before Burk left Cape May the past summer of 1851, he came to Mr. Brolasky's cottage at half-past ten in the evening and said that Mr. Ware offered to give $3,000 to pay the mortgage; that Mr. Miller was very stubborn and did not want to give but $2,800. Mr. Brolasky said he did not care anything about it and they parted. In the conversation I heard on the piazza I remember Mr. Burk said that Miller had an idea of getting clear of these mortgages like a man in Trenton or East Jersey, who borrowed money and gave a pair of horses and carriages to get it and lost it, but his was a different transaction; he had sold his mortgages for what he pleased and got the money for them. Upon that occasion Mr. Brolasky complained that Mr. Burk had been endeavoring to make the impression on Mr. Miller that the $100 came out of the $2,800 mortgage, and Mr. Burk said it did not come out of that mortgage, but out of the two mortgages he sold. This conversation occurred when Mr. Brolasky and Burk were out on the piazza. And then my brother said why don't you state the whole truth to Mr. Miller and it may be settled or compromised. After that it was that Mr. Burk came to the cottage and said what Miller & Ware would settle it for. After Mr. Brolasky quit business he had a stock of goods left, which he took home to his house to sell by hand rather than expose them by auction. Mr. Clark purchased some of these goods. Mr.

Burk previously came there and examined them.   Afterwards he and Mr. Clark came together.   Mr. Clark took of those goods all that would suit him, and then requested Mr. Brolasky to purchase for him some heavy domestic goods that he had not. Mr. Brolasky went out with a memorandum furnished by Clark and bought what Clark wanted.   The whole amount of goods furnished to Mr. Clark was about $800.   I had charge and showed Mr. Clark the goods.   Those goods were sold under market price—some of them less than they cost.   We were selling all our goods in that way to save sending them to auction. Mr. Burk said they were checked, and any man who knew how to sell them could make money by buying them.   After the goods were packed Mr. Burk came up with a memorandum how the goods were to be marked, and where they were to go.   They were to be sent down to the wharf to go on board a shallop to Cap cMay for Mr. Clark.   The goods were started next morning.   The drayman was loading the goods and I observed Mr. Burk standing behind the corner of St. John's Church, in 13th street, apparently watching these goods.   He waited there and did not come to the house.   His manner had the appearance of his being there secretly to watch these goods.   He remained there until the drayman passed the corner and he went to the drayman and turned the drayman up 13th street, instead of going down 13th street.   I went to the corner and watched him until they got to Market street and he turned down Market. Mr. Burk's store was at that time on Market street.   I ordered the drayman to take the goods to the address on the card, which was to a shallop at the wharf to go to Cape May.   I do not know the drayman nor his name.   I know Mr. Burk detained those goods at his store, and he said he did so because Mr. Clark owed him money.   Mr. Clark came up and came to our house to see why the goods had not come down.   I told him the goods had been sent.   I know that my brother gave his note to Mr. Burk for between $500 and $600 to pay Clark's debt to Burk before Burk would let these goods go.   This day two weeks ago Mr. Burk called at my brother's house in Walnut street, Philadelphia.   He enquired for Mr. Brolasky ; he not being in he

sent for any member of the family who could see him, and I went down.  While waiting for Mr. Brolasky's return he said he had been notified to attend at Camden as a witness in this cause.  After a good deal of other conversation he remarked that he did not see why they should meddle with his business; that these old mortgages were in his hands to do what he pleased with them, and that he had sold them, and it was nobody's business; that a man who had notes or bonds had a right to sell them for what he pleased.  He spoke of Clark and said he would not believe him on his oath.  I said to him I am surprised to hear you say so, for I understand you have given the information that has led to this trouble.  He then said that any body that had told he had been giving information or had been examined by any lawyer or before any Court told a bare-faced falsehood.  I asked him if he had not been over to Camden to be examined.  He said if he had to die he had never been. Soon after Mr. Brolasky returned Mr. Burk said to him I have called to say I have to go to Camden as a witness in your cause. You had better hunt up all your papers.  You have got some that will be of great use to you.  He spoke of two notes Mr. Brolasky had given him for the mortgages.  He said he was surprised that they did not pay it; that they got the place cheap enough; that the transaction was an honorable one.  He said they wanted him to say that Brolasky wanted a bonus allowed on the mortgage.  And that Mr. Brolasky never had asked it and did not get it.

*Henry Brolasky,* a witness produced upon the part of the complainant, being duly sworn according to law, doth depose and say : Mr. Burk came to my father's cottage, at Cape May, in July, 1851, and said he wanted to see a receipt that he had given my father for the two old mortgages of $800 and $600.  He said he wanted to show it to Mr. Ware.  My folks agreed I should go with it and take it.  Burk and myself started to go to Ware's house.  We met him in the street.  I took the receipt out and read it to him in the presence of Burk.  Mr. Burk told Ware he had forgotten he had given the receipt.  He told

me that the $100 was allowed on the two mortgages of $800 and $600, that it was a perfectly fair transaction. I met Mr. Burk one day after this in the street; he said he had just come from Congress Hall and had seen Mr. Miller; he thought he could make a compromise, for Miller had offered to give $2,800. He had also seen Mr. Ware; that Ware offered to give $3,000. He said he thought they had better settle it; that they would lose if they went to law. In a conversation I had with him I remember that he said the $100 was allowed on the two mortgages of $800 and $600. He said nothing to me about the new mortgage. He said he was present when the goods were selected by Clark, and they were sold at reasonable prices.

*R. P. Thompson* for the complainant.

*William Halsted* for defendants.

The CHANCELLOR declared the bond and mortgage to be usurious, and ordered the bill dismissed.

Order accordingly.